UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

LETONYA CREIGHTON, ET AL.                    CIVIL ACTION

VERSUS                                       NO. 07-7194

FLEETWOOD ENTERPRISES, INC.,                 SECTION: R
ET AL.

## ORDER AND REASONS

Before the Court is plaintiffs' motion to remand.  R. Doc.
77.  For the following reasons, the Court GRANTS the motion.


**I.    BACKGROUND**

This case arises out of an explosion within a temporary
housing unit provided by the Federal Emergency Management Agency
(FEMA).  According to the petition, plaintiff Letonya Creighton
and her son, plaintiff Deshawn Creighton, "enjoy[ed] the use and
occupancy" of the trailer in question until the date of the
accident, September 14, 2006.  Pet., R. Doc. 1-2 at 2.  The
plaintiffs allege that, on that date, the trailer "suddenly and
without warning exploded" while Deshawn Creighton was inside,
causing him "severe and disabling injuries."  *Id.*

On September 13, 2007, Letonya Creighton filed an action in the 22nd Judicial District Court in Louisiana in her individual capacity and on behalf of Deshawn Creighton, who was then a minor.[1] Among the defendants named in the petition were FEMA; Whirlpool Corp., the manufacturer of a stove that allegedly contributed to the explosion; Fleetwood Enterprises, Inc., the manufacturer of the trailer; and American Radiation Services, Inc. (ARS), a government contractor responsible for inspecting and maintaining the FEMA trailers. *Id.* at 2-4. As relevant to this motion, plaintiffs alleged that ARS was negligent in three different ways: (1) "[f]ailure to train its employees on performing adequate inspection of TRAILER and/or component parts thereof"; (2) "[n]egligently inspecting the TRAILER and/or component parts thereof"; and (3) "[f]ailing to warn [plaintiffs] of the danger and/or defects in said trailer." Pet., R. Doc. 1-2 at 3-4. Whirlpool removed the action to this Court "with the acknowledgment and consent of American Radiation Services" on October 23, 2007. Notice of Removal, R. Doc. 1 at 4. Whirlpool's Notice of Removal claimed that ARS was acting under the color of federal authority at the time of the allegedly tortious acts and that removal was therefore proper under the federal officer removal statute, 28 U.S.C. § 1442.

---

[1] Deshawn Creighton has since reached majority and has taken over the claims brought on his behalf. R. Docs. 32, 41.

FEMA was never served with process and was dismissed as a defendant on June 3, 2008. R. Doc. 54. Several months later, on November 11, 2008, plaintiffs filed the present motion to remand the action to state court. R. Doc. 77. They argue that the requirements of the federal officer removal provision are not met in this case and that the court therefore lacks subject matter jurisdiction over the controversy. The three remaining named defendants have filed memoranda in opposition, arguing that American Radiation Services meets the criteria for federal officer removal. R. Docs. 83-85. The Court has considered the parties' arguments and now rules as follows.

## II.  LEGAL STANDARD

A removed case must be remanded to state court "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction." 28 U.S.C. § 1447(c). The defendants argue that jurisdiction in this case is properly founded upon the federal officer removal statute, 28 U.S.C. § 1442(a). Although the parties do not discuss other possible bases of jurisdiction, the Court notes that there is not complete diversity of citizenship in this case, nor is a federal question presented on the face of the complaint.

The federal officer removal statute provides, in relevant part:

A civil action or criminal prosecution commenced in a State court against any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

> (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue. ...

28 U.S.C. § 1442(a). The Supreme Court has explained that the purpose of this provision is to protect the lawful activities of the federal government from undue state interference. *See Willingham v. Morgan*, 395 U.S. 402, 406 (1969). Because the federal government "can act only through its officers and agents," it has a strong interest in ensuring that the states do not hinder those officers in the execution of their duties. *Id.* (quoting *Tennessee v. Davis*, 100 U.S. 257, 263 (1880)). If federal officers acting within the scope of their authority "can be arrested and brought to trial in a State court, for an alleged offense against the law of the State, yet warranted by the Federal authority they possess, and if the general government is powerless to interfere at once for their protection ... the operations of the general government may at any time be arrested at the will of one of its members." *Id.* (quoting *Davis*, 100 U.S. at 263); *see also Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 127 S. Ct. 2301, 2305 (2007) ("As Senator Daniel

Webster explained [in 1833], where state courts might prove hostile to federal law, and hence to those who enforced that law, the removal statute would 'give a chance to the [federal] officer to defend himself where the authority of the law was recognised.'") (quoting 9 Cong. Deb. 461 (1833)).

Because of its broad language and unique purpose, the federal officer removal statute has been interpreted to operate somewhat differently than the general removal provision.  Unlike the general removal statute, which must be "strictly construed in favor of remand," *Manguno v. Prudential Property & Casualty Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002), the federal officer removal provision's broad language must be liberally interpreted. *Watson*, 127 S. Ct. at 2305; *but see id.* (noting that "broad language is not limitless" and that "a liberal construction nonetheless can find limits in a text's language, context, history, and purposes").  Also unlike the general removal provision, there is no requirement in the federal officer removal provision that the district court have original jurisdiction over the plaintiff's claim.  A case against a federal officer may be removed even if a federal question arises as a defense rather than as a claim apparent from the face of the plaintiff's well-pleaded complaint.  *Jefferson County, Ala. v. Acker*, 527 U.S. 423, 430-31 (1999).  Finally, the right of removal under section 1442(a) is personal to the federal officer and does not require

the consent of the other defendants.  *See Bradford v. Harding*, 284 F.2d 307, 310 (2d Cir. 1960) (Friendly, J.) (noting that the phrase "may be removed by them," 28 U.S.C. § 1442(a), means "by any of the following persons" and that "defendants who are not federal officers are not such persons").

As in all cases, the party asserting federal jurisdiction in a case removed under section 1442 bears the burden of establishing that jurisdiction exists.  *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 398 (5th Cir. 1998).  The Fifth Circuit has adopted a three-part test to determine whether a government contractor qualifies as a "person acting under [a federal] officer" who is "sued in an official or individual capacity for any act under color of such office."  28 U.S.C. § 1442(a).  The contractor must prove that:

> (1)  he is a "person" within the meaning of the statute;
>
> (2)  he acted pursuant to a federal officer's directions, and a causal nexus exists between his actions under color of federal office and the plaintiff's claims; and
>
> (3)  he has a colorable federal defense to the plaintiff's claims.

*Winters*, 149 F.3d at 398, 400.  In addressing the jurisdictional inquiry, courts must credit the defendant's theory of the case.  *Acker*, 527 U.S. at 432.


## III. DISCUSSION

The question presented by plaintiffs' motion to remand is

whether the claims against defendant American Radiation Services,
Inc., are covered by the federal officer removal statute.[2]  The
parties do not dispute that ARS is a "person" within the meaning
of the statute.  *See Winters*, 149 F.3d at 398 ("[C]orporate
entities qualify as 'persons' under § 1442(a)(1).").  The points
of contention are: (1) whether ARS acted pursuant to a federal
officer's directions, (2) whether a causal nexus exists between
ARS's actions under color of federal office and the plaintiff's
claims, and (3) whether ARS is able to assert a colorable federal
defense.  Because the Court finds that the defendants have not
shown that ARS "acted under" FEMA within the meaning of section
1442, *see infra*, there is no need to address the availability of
a federal defense.

Plaintiffs have alleged that ARS was negligent in three
different ways: (1) "[f]ailure to train its employees on
performing adequate inspection of [the] TRAILER and/or component
parts thereof"; (2) "[n]egligently inspecting the TRAILER and/or

---

[2] The defendants do not argue for jurisdiction on the ground
that FEMA was originally named as a defendant.  Although FEMA is
undoubtedly an agency of the United States covered by section
1442, it was never served with process, and the Court therefore
did not have personal jurisdiction over it.  *See* R. Doc. 54.  The
Court takes the defendants' silence on this matter as an
admission that jurisdiction cannot be based on plaintiffs'
decision to name FEMA in their state court petition.  *Cf. IMFC
Professional Services of Florida, Inc. v. Latin American Home
Health, Inc.*, 676 F.2d 152, 159 (5th Cir. 1982) (holding that
"elimination of the federal officer from a removed case does not
oust the district court of jurisdiction (*except where there was
no personal jurisdiction over the officer*)") (emphasis added).

component parts thereof"; and (3) "[f]ailing to warn [plaintiffs] of the danger and/or defects in said trailer." Pet., R. Doc. 1-2 at 3-4. In order to carry their burden on the second element of the Fifth Circuit's federal officer removal test, defendants must show that they were "acting under" FEMA when they performed the acts that form the basis for these claims. *Watson*, 127 S. Ct. at 2304; *Winters*, 149 F.3d at 398.

The Supreme Court has not addressed the circumstances in which a private contractor will be considered to have acted under a federal officer, *see Watson*, 127 S. Ct. at 2308 (expressly reserving the question), but the Fifth Circuit has required a high degree of government direction and oversight for the contractor to qualify. In *Winters v. Diamond Shamrock Co.*, 149 F.3d 387, and *Miller v. Diamond Shamrock Co.*, 275 F.3d 414 (5th Cir. 2001), cases against military contractors for their role in producing the allegedly carcinogenic defoliant Agent Orange, the Fifth Circuit upheld removal jurisdiction based on the close supervisory relationship between the government and the contractors. The Fifth Circuit found that the government had exercised "strict control over the development and subsequent production of Agent Orange," *Miller*, 275 F.3d at 418 (quoting *Winters*, 149 F.3d at 399), and emphasized that the government "specifically asked the defendants to produce Agent Orange using" undiluted quantities of the allegedly dangerous ingredient. *Id.*;

*see also Winters*, 149 F.3d at 399 ("Although the defendants had produced 2,4-D and 2,4,5-T for commercial use before government involvement, their commercial formulations were never composed of a mixture of 100% pure 2,4-D/2,4,5-T, which the government required for the most part ... in its contracts with the defendants."). The clear implication of these cases is that the government must exercise substantial control over the manner in which a private company performs its contractual obligations before the contractor will be considered to have "act[ed] under" a federal officer.

The district courts in this circuit have followed this understanding of the Agent Orange cases, requiring that the federal officer's control over a private contractor be "direct and detailed." *City of Petal, Miss. v. Ashbritt, Inc.*, No. 08-152, 2008 WL 4372758, at *2 (S.D. Miss. Sep. 22, 2008); *see also Breaux v. Gulf Stream Coach,* Inc., No. 08-893, 2009 WL 152109, at *3 (E.D. La. Jan. 21, 2009) (collecting cases); Kristine Cordier Karnezis, Annotation, *Who Is "Person Acting Under" Officer of United States or Any Agency Thereof for Purposes of Availability of Right to Remove State Action to Federal Court Under 28 U.S.C.A. § 1442(a)(1)*, 166 A.L.R. FED. 297 (2009) (same). Courts typically consider three factors in this analysis: (1) the level of detail in the government's specifications, (2) the government's compulsion with regard to the specifications, and

(3) the degree of supervision exercised by the government. *Breaux*, 2009 WL 152109, at *3. Of course, there must also be a causal nexus between the government's "direct and detailed" control and the allegedly tortious acts. A contractor that works under the close supervision of the federal government in one context does not thereby obtain the right to remove every suit filed against it to federal court.

This case thus turns on whether FEMA exercised "direct and detailed control" over ARS and whether there is a causal nexus between FEMA's control and the tortious acts alleged in the petition. The contract between FEMA and ARS divides ARS's responsibilities into four principal categories: initial "phase-in" duties; maintenance of the temporary housing units; deactivation of the temporary housing units; and customer service and quality assurance. Performance Work Statement, R. Doc. 85-3 at 1-2. It is apparent that the parties intended for ARS to exercise a substantial amount of discretion and independent judgment within each of these broad categories.

The contract's Performance Work Statement specifies at the outset that it "establishes the *minimum requirements* for disaster area maintenance of temporary housing units." Performance Work Statement, R. Doc. 85-3 at 3 (emphasis added). FEMA assumed authority over certain narrow areas, *see, e.g.*, *id.* ("FEMA will ... [b]e responsible for vandalism, domestic problems, disruptive

tenants, and tenants refusing service at each site."), but there is no indication that FEMA intended to retain general responsibility for the details of implementation. To the contrary, the contract establishes a specific procedure through which FEMA's representative could issue written directives supplementing and clarifying the general contract provisions.[3] *See id.* at 29. The implication of this provision is that ARS was solely responsible for determining how to execute the contract in the absence of written directions. In addition, the contract contemplates that ARS would be "responsible for errors and omissions committed by it," except to the extent that FEMA caused or contributed to ARS's liability. Contract, R. Doc. 85-2 at 37. All of these provisions suggest that, as a general matter, the parties intended for ARS to exercise discretion and independent judgment in the performance of its duties.

Defendants point to a number of specific provisions in the contract to demonstrate the requisite degree of control. For example, they note that the contract required ARS to "set up and operate a toll-free maintenance telephone number for occupants of [trailer] units to call and report maintenance problems." Performance Work Statement, R. Doc. 85-3 at 2. In a similar vein, they point out that the contract required ARS to obtain the

---

[3] The defendants have not suggested that FEMA's representative issued any such directive with respect to ARS's training and inspection procedures.

permission of the FEMA Contracting Officer's Technical
Representative before it replaced any part worth more than $250.
*See id.* at 4. ARS has also submitted the affidavit of its
president, Danny Coleman, who recites several of the contractual
requirements and adds that ARS was in daily contact with FEMA
"regarding the inspections and work to be performed pursuant to
the contract." Coleman Aff., R. Doc. 85-3 at 35. The defendants
argue that this evidence establishes that "FEMA provided detailed
instructions on what ARS was suppose[d] to do and how ARS was
suppose[d] to assist FEMA in carrying out the tasks involved in
the temporary housing assistance program." Fleetwood Brief, R.
Doc. 84 at 13.

Few of the cited provisions have any connection to ARS's
allegedly tortious conduct, however. For example, there is no
apparent relationship between ARS's compliance with the toll-free
telephone number provision and its allegedly negligent inspection
and training. Similarly, the defendants do not explain how the
contract provisions relating to the repair and replacement of
housing components are connected to the manner in which ARS was
required to inspect trailers and train its employees. The only
government control that matters for removal purposes is control
that is causally related to the plaintiffs' claims. *Winters*, 149
F.3d at 398. If the defendants cannot demonstrate a causal
connection, the degree of control exerted by FEMA over matters

unrelated to the plaintiffs' claims is not important, no matter how "direct and detailed" it might have been.

Four clauses in the contract speak to inspection and training. The first clause provides:

> The contractor shall at a minimum ... [p]rovide maintenance services of units assigned by FEMA. This maintenance services contract includes performing monthly preventative maintenance inspections, responding to routine and emergency maintenance calls, making repairs, and providing pest control services as required for units assigned to the contractor and/or identified by FEMA.

Performance Work Statement, R. Doc. 85-3 at 3; *see also id.* at 12 (same). Two things are notable about this provision. First, it establishes only a set of minimum requirements. Unlike the procurement contracts at issue in *Winters*, which "specifically dictated" the composition of Agent Orange, 149 F.3d at 399, the contract in this case granted ARS the discretion to conduct its inspections in any manner consistent with the contract's minimum requirements. Second, the minimum inspection requirement is extremely vague. It simply provides that ARS must "perform[] monthly preventative maintenance inspections." Performance Work Statement, R. Doc. 85-3 at 3. There are no further details in the contract regarding the manner in which inspections were supposed to be performed, and nothing in Danny Coleman's affidavit indicates that FEMA gave more detailed instructions during the routine communications between ARS and FEMA. *See* Coleman Aff., R. Doc. 85-3 at 35.

Another clause in the Performance Work Statement provides that, in issuing work orders to ARS, "[g]enerally FEMA will use a FEMA form 90-38, 'Mobile Home Maintenance Work Order' or other appropriate documentation." Performance Work Statement, R. Doc. 85-3 at 9. The defendants suggest that the use of this form constrained their discretion in performing inspections. The record indicates, however, that the FEMA form was not used during routine inspections of the trailers. For example, the forms for the trailer at issue, captioned "Preventative Monthly Maintenance Inspection Work Orders," are imprinted with the ARS logo and lack any indication that FEMA contributed to their creation. *See* ARS Forms, R. Doc. 85-3 at 32-33.

The contract clauses covering employee training are similarly lacking in detail. The clauses, which appear within the section of the contract dealing with "Contractor Responsibilities," provide:

> 5.6 Contractor Expectations. All contractor staff is expected to carry themselves in a professional manner. It is the contractor's responsibility to monitor and supervise their staff work, professionalism, and behavior. The contractor must be able to provide a background check of employees as requested.

> 5.7 Qualification of Personnel. Work performed under this task shall be completed by professionally certified mechanics with expertise in heating and air conditioning (HV AC), refrigeration, range, electrical, travel trailers, and/or plumbing repairs. If it is appropriate under State and local requirements[,] Journeyman employees supervised by Licensed Technicians may perform work. However, the contractor is required to provide a copy of the regulation.

-14-

Performance Work Statement, R. Doc. 85-3 at 11. Danny Coleman adds in his affidavit that FEMA "had the right to exclude any ARS employee that it deemed 'unsuitable' for the inspection of the FEMA trailers." Coleman Aff., R. Doc. 85-3 at 35.

Although the personnel provisions are somewhat more detailed than the inspection provisions, they do not provide evidence of the type of "direct and detailed control" necessary to support federal jurisdiction. The contract grants ARS responsibility for monitoring and supervising its staff and requires only that ARS's mechanics be "professionally certified" and have "expertise" in particular types of repairs. Performance Work Statement, R. Doc. 85-3 at 11. There is nothing in the contract or in Danny Coleman's affidavit to indicate that FEMA exercised more detailed control over the training of ARS employees.

This Court recently granted a motion to remand on very similar facts. In *Breaux v. Gulf Stream Coach, Inc.*, the plaintiff filed a wrongful death action against, *inter alia*, the company responsible for inspecting a FEMA trailer that later exploded. *Breaux*, 2009 WL 152109, at *1. As in this case, the contract between FEMA and the contractor defendant was "substantially detailed" and included certain "minimum requirements for maintenance" and reporting requirements. *Id.* at *4. Nevertheless, the Court found that the contractor was vested with discretion to exceed the minimum requirements and was

ultimately responsible for implementing FEMA's work plan on its own. *Id.* at *4-*5. A review of the entire contract convinced the Court that the contractor, rather than the government, "was primarily responsible for the supervision of repairs, correction of problems, and provision of maintenance." *Id.* at *5. Per the Court: "The 'acting under' element is not satisfied when, as here, a company follows basic contractual parameters after the government has entered the market to obtain a service." *Id.; see also Joseph v. Fluor Corp.*, 513 F. Supp. 2d. 664, 672 (E.D. La. 2007) ("Although FEMA's purchase orders 'establish[] some basic parameters within which [the manufacturers'] services are to be performed,' it is simply not the case that private entities are entitled to a federal forum whenever litigation arises concerning products sold to the federal government.") (quoting *Guillory v. Ree's Contract Service, Inc.*, 872 F. Supp. 344, 348 (S.D. Miss. 1994)).

ARS cites five district court cases in opposition to remand. Three of those cases provide further support for the conclusion that private contractors may invoke the federal officer removal statute only when the government's control over their activities is substantially greater than it was in this case, and the other two do not provide enough details about the contracts to allow useful points of comparison. *See In re Katrina Canal Breaches*, No. 05-4182, 2007 WL 2042434, at *2 (E.D. La. July 12, 2007);

*Grand Acadian, Inc. v. Fluor Corp.*, No. 07-295, 2007 WL 4622775, at *1 (W.D. La. Nov. 7, 2007) (magistrate judge's report and recommendation).

In *Lane v. Halliburton*, No. 06-1971, 2006 WL 2583438 (S.D. Tex. Sep. 7, 2006), the plaintiffs sued a military contractor for injuries sustained during an attack on a truck convoy in Iraq, alleging that the convoy was "dispatched into an area known by the Army to have been subjected to continuous attack by anti-American factions." *Lane*, 2006 WL 2583438, at *1. The district court held that the military contractor properly removed under the federal officer removal statute, finding that the route had been selected by the military and that the contractor had no knowledge of the route before the day of the mission. *Id.* at *3. In *Miles v. Sewerage & Water Bd. of New Orleans*, No. 04-1587, 2004 WL 1794527 (E.D. La. Aug. 10, 2004), this Court upheld a construction contractor's removal on the ground that "[p]rior to performing each stage of work, [the contractor] had to submit proposed construction methods and items of equipment to be used, and these had to be approved by the [Army Corps of Engineers]." *Miles*, 2004 WL 1794527, at *2. In a related case, *Shimon v. Sewerage & Water Bd. of New Orleans*, No. 05-1392, 2007 WL 4414709 (E.D. La. Dec. 14, 2007), this Court again upheld a construction contractor's removal, emphasizing that the Army Corps of Engineers performed daily inspections of the contractor's work,

required the contractor to seek prior approval of work and equipment, and "provided very detailed project specifications pertaining to the monitoring of vibrations, the driving of timber piles, and the specifications on dewatering and the construction of the temporary restraining structure." *Shimon*, 2004 WL 1794527, at *3.

In all three cases, major portions of the operations that gave rise to the plaintiffs' claims were closely supervised or dictated by the federal government. *Cf. Reed v. Fina Oil & Chem. Co.*, 995 F. Supp. 705, 710 (E.D. Tex. 1998). Here, by contrast, FEMA provided certain minimum requirements and left the remaining details of implementation to the discretion of ARS. For these reasons, the Court must conclude that the defendants have not demonstrated that the level of control exercised by FEMA over ARS's inspection and training activities was sufficiently "direct and detailed" to support federal jurisdiction. "The 'acting under' element is not satisfied when, as here, a company follows basic contractual parameters after the government has entered the market to obtain a service." *Breaux*, 2009 WL 152109, at *5.

The Second Circuit's recent opinion in *Isaacson v. Dow Chemical Co.*, 517 F.3d 129 (2d Cir. 2008), another Agent Orange case, does not change this Court's conclusion. There, the Second Circuit interpreted the Supreme Court's decision in *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 127 S. Ct. 2301 (2007),

-18-

to permit removal any time a private contractor "assists, or helps carry out, the duties or tasks of the federal superior." *Isaacson*, 517 F.3d at 137 (quoting *Watson*, 127 S. Ct. at 2307) (internal brackets and ellipses omitted). The Court finds that *Watson* did not compel the standard adopted by the Second Circuit, and that the "direct and detailed control" test applied in this circuit continues to govern this Court's analysis.

In *Watson*, the plaintiffs alleged that defendant Philip Morris had engaged in unfair and deceptive trade practices in connection with its method of testing and advertising "light" cigarette products. Philip Morris removed to federal court under the federal officer removal provision, arguing that the testing method at issue had been developed pursuant to the detailed regulatory guidance of the Federal Trade Commission. The Supreme Court rejected this argument, finding that "a private firm's compliance ... with federal laws, rules, and regulations does not by itself" support removal, "even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored." *Watson*, 127 S. Ct. at 2308. In arriving at this conclusion, the Supreme Court observed that a "private person's 'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id.* at 2307 (emphasis in original).

The Second Circuit apparently read this last passage as establishing a comprehensive test for determining when a private contractor "acts under" a federal officer. But the Supreme Court was clear that its decision reached only the question of whether compliance with detailed federal laws and regulations will permit a private company to invoke the federal officer removal provision. *See id.* at 2308. The Court used the "assist [or] help carry out" language to distinguish "a company ... subjected to intense regulation" from a contractor under "close [government] supervision." *Id.* Whereas the latter "helps officers fulfill ... basic governmental tasks," the former simply complies with the law and therefore cannot be said to be "acting under" a federal officer. *Id.*

The Supreme Court expressly declined to further address the applicability of the federal officer removal provision to government contractors. *See id.* ("For present purposes that distinction is sufficient. And we need not further examine here (a case where private contracting is not at issue) whether and when particular circumstances may enable private contractors to invoke the statute."). The Court held only that a private company must "assist [or] help carry out" a governmental task before it will be considered to "act under" a federal officer. It did *not* hold that every private firm that assists a federal officer with a governmental task will be considered to have

"acted under" that officer.  In other words, the Court held that assisting with a governmental task is a necessary condition for a firm to be considered "acting under" a federal officer, but it did not hold that this is a sufficient condition.

As the foregoing discussion makes clear, *Watson* did not abrogate or modify the prevailing test in the Fifth Circuit.  The Supreme Court merely clarified in *Watson* that private firms are not entitled to invoke the federal officer removal statute based solely on government control exerted through laws and regulations.  For these reasons, the Court has declines to adopt the Second Circuit's expansive interpretation of *Watson* and adheres to this circuit's established approach.  *Accord Breaux*, 2009 WL 152109, at *3 ("The Fifth Circuit's traditional test for 'direct and detailed control' ... is consistent with the holding in *Watson*."); *Walker v. AMID/Metro Partnership LLC*, No. 08-4606, 2008 WL 5382372, at *6 (E.D. La. Dec. 19, 2008) ("*Watson* has not altered the existing 'direct and detailed control' analysis under Fifth Circuit law for federal officer removal.").

**IV.  CONCLUSION**

For the foregoing reasons, plaintiffs' motion to remand is GRANTED.

New Orleans, Louisiana, this <u>5th</u> day of May, 2009.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE